**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |  |
|---|---|---|
| **TODD V. CAMPBELL,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 3:11cv2-DWD** |
| **VERIZON VIRGINIA, INC.,** | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on the Defendant's Motion for Summary Judgment (ECF No. 20) and the Plaintiff's Motion for Leave to Amend his Brief in Opposition thereto (ECF No. 27).  The matter has been thoroughly addressed by the parties' submissions and the Court has entertained oral argument on the matter.  For the reasons stated herein, the Court shall GRANT the Defendant's Motion for Summary Judgment (ECF No. 20) and DENY the Plaintiff's Motion for Leave (ECF No. 27).

### I. PRELIMINARY ISSUES

The Court must address two preliminary matters that have been raised by the Plaintiff before it can adequately set-forth the factual and procedural background of the case.  First, the Plaintiff seeks leave of the Court to supplement the record with belatedly discovered payroll records.  Second, the Plaintiff has objected to the use of his own deposition transcript in support of the Defendant's Motion for Summary Judgment without the Court also considering his *errata* sheet, which was not yet due at the time of oral argument.  Because both issues affect the Court's

utilization of the record establishing the undisputed material facts necessary for resolution of the Motion for Summary Judgment, both issues must be initially addressed.

**A.      Plaintiff's Motion for Leave to Amend his Brief in Opposition**

The Court will deny Plaintiff's Motion for Leave because the deadline for submitting his opposition to the motion has expired and the Plaintiff has not established that the delay results from excusable neglect.  See Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . after the time has expired if the party failed to act because of excusable neglect"); Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993) (applying abuse of discretion standard when reviewing enforcement of Rule 6(b) but strictly construing the rule itself).  Simply noting that he only discovered the payroll records *after* he filed his opposition to the Defendant's Motion for Summary Judgment is insufficient in and of itself, absent an explanation of *why* he neglected to timely search for and submit the records.

Moreover, "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  Orsi, 999 F.2d at 92 (citations omitted).  For documents to be considered, they "must be authenticated by and attached to an affidavit" that meets the strictures of Rule 56.  Id (citations omitted).  Here, no such attempt to authenticate the documents has been made.  And although the documents appear to be copies of the Defendant's own records, the Plaintiff has not articulated how the material contained therein establishes any dispute of *material* fact.[1]  Accordingly, the Court denies the motion on this additional basis.

_____

[1] The payroll records at issue tend to suggest, albeit unclearly, that the Plaintiff was not paid for leave taken during a week while he was gambling at Atlantic City, as the Defendant has asserted throughout this case.  However, there is no dispute here that the Plaintiff invoked leave pursuant to the Family Medical Leave Act ("FMLA" or the "Act"), 29 U.S.C. §§ 2601-2654, and it is

**B.      The Plaintiff's Deposition *Errata* Sheet**

The Plaintiff initially objected to the Defendant's use of his own deposition in support of its Motion for Summary Judgment, arguing that he had not yet signed the transcript after reviewing it pursuant to Fed. R. Civ. P. 30(e).  At oral argument, the Court directed counsel for Campbell to have his client do so immediately.  Pursuant to the Court's instruction, the Plaintiff has now filed with the Court a copy of his executed signature page to the deposition transcript, including an *errata* sheet containing four additions to his testimony.  Accordingly, the objection is now overruled as moot, and the Court will consider the Plaintiff's deposition in resolving the Defendant's Motion for Summary Judgment.

However, the questionable nature of the Plaintiff's newly-formulated testimony vis-à-vis an *errata* sheet gives the Court pause.  There presently exists a split of authority as to how a court should reconcile such conflicting testimony, and disagreement even persists among federal courts sitting in the Court's own state of Virginia.  Compare Touchcom, Inc. v. Bereskin & Parr, No. 1:07cv114, 2011 U.S. Dist. LEXIS 72905, at *10 (E.D. Va. July 7, 2011) (permitting correction of inaccuracies, but not tactical adjustments) with Foutz v. Town of Vinton, 211 F.R.D. 293, 295 (W.D. Va. 2002) (permitting broad substantive changes to deposition testimony).

One series of cases suggests that the scope of changes permitted pursuant to Rule 30(e) is essentially boundless.  See, e.g., Holland v. Cedar Creek Mining, Inc., 198 F.R.D. 651, 653 (S.D. W. Va. 2001).  Where such an approach is followed, the opposing party may nevertheless impeach a witness with any contradictory, unpolished statements.  See Usiak v. New York Tank Barge Company, Inc., 299 F.2d 808, 810 (2d Cir. 1962) (finding error in the trial court's refusal

---

therefore immaterial whether such leave was paid so long as the Plaintiff was given notice that it would "count against" his total allotted leave under the Act.

to permit the use of pre-errata sheet testimony to impeach a witness).  That is to say, the conflicting statement is not replaced, and the deponent is instead left with both the original testimony and the *errata* sheet.  The other approach taken by some courts is to simply strike any changes attempting to alter the substance of the deponent's testimony.  See, e.g., Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992) ("[Rule 30(e)] cannot be interpreted to allow one to alter what was said under oath").  Each approach is intended to ensure that the deponent does "not stand in any better case" as a result of his substantive revisions to his own testimony.  Foutz, 211 F.R.D. at 295 (internal quotation marks omitted).

Under certain circumstances, the substantive use of an *errata* sheet to change deposition answers is analogous to a "sham" declaration designed solely to defeat summary judgment, especially where such material is submitted after briefing and oral argument on the related motion.  See Francisco v. Verizon South, Inc., 756 F. Supp. 2d 705, 714 (E.D. Va. 2010).  "[I]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct."  Grace v. Family Dollar Store, Inc. (In re Family Dollar FLSA Litigation), 637 F.3d 508, 512 (4th Cir. 2011).  The Court will take no position on the present state of disagreement among the courts on the issue because, as this Court perceives it, neither approach would permit the use of a "sham" *errata* sheet whose sole apparent purpose is to create a genuine issue of material fact intended to preclude the granting of dispositive relief.  Stated another way, pursuant to either rule, the Plaintiff cannot create a genuine issue of material fact where the sole issue is to "determine which of the two conflicting versions . . . is correct."  Id.

Here, however, it is not entirely clear in any event that the Plaintiff's *errata* sheet contains any material evidence whatsoever.  The Plaintiff has simply emphasized several of his

statements given during the deposition to the effect that he *believes* that his use of FMLA leave had some causal connection to any number of other suspected reasons for his termination. The Plaintiff's stated *belief* that wrongdoing occurred provides no *evidentiary* basis to defeat summary judgment. Such an effort is apparently done to undermine the Plaintiff's several prior statements by which he theorized that the Defendant terminated his employment for non-FMLA related reasons. Accordingly, while the Court will not strike the statements contained in the *errata* sheet, it also will not permit the Plaintiff to create a genuine issue of material fact where none previously existed. With such a construction of the *errata* sheet in mind, the Court will now proceed to set forth the basic, undisputed facts necessary to resolve the Defendant's pending Motion for Summary Judgment.

## II. BACKGROUND

The parties have submitted their respective statements of undisputed material facts pursuant to the Court's Local Rules, and the Court has reviewed the statements, including the references to the supporting evidence of record. As required, the Court resolves all genuine disputes of material fact in favor of the non-moving party and disregards those factual assertions that are immaterial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Applying that basic standard, the Court concludes that the following narrative represents the facts for purposes of resolving the motion for summary judgment.

Todd V. Campbell ("Campbell" or the "Plaintiff") was hired by Verizon Virginia, Inc. ("Verizon" or the "Defendant") in May 1998 as a service technician, later rising to the level of cable splicing technician. (Deposition of Todd Campbell ("Campbell Dep.") at 38:16-39:7.) For the most part, his employment was uneventful during his eleven years with Verizon and he

tended to maintain good relations with his supervisors.  (Id. at 40:2-41:21.)  However, starting in April 2008, Campbell began to gamble and things quickly deteriorated.  (Id. at 79:22-25.)

Soon thereafter, Campbell began to suffer from severe depression, migraines, and stress-related anxiety.  (Id. at 65:16-68:20.)  His condition was serious enough that he became suicidal at times.  (Id. at 79:16-21.)  Pursuant to the Family and Medical Leave Act ("FMLA" or the "Act"), 29 U.S.C. §§ 2601-2654, Campbell applied to Verizon for approval of intermittent leave from work of between one (1) and three (3) days at a time, to be used as needed over a period of eighteen (18) months, beginning in January 2009.  (Campbell Dep. at 65:21-66:7.)  In the midst of those developments, Campbell's gambling developed to the level of an addiction.  (Id. at 79:19-80:25.)

Verizon approved Campbell's request for intermittent FMLA leave, commencing December 17, 2008, and it continued to approve the leave through December 16, 2009, much of which was fully paid leave pursuant to Verizon's policy of unlimited sick leave.  (Id. at 101:2-14; Deposition of Albert Foxwell ("Foxwell Dep.") at 44:4.)  The approval document did not contain any *explicit* limitations on how Campbell was to spend his time during intermittent leave periods.  (Foxwell Dep. at 50:3-8.)  While his FMLA certification was in effect, and up to the time of his termination in September 2009, Verizon never tried to prevent Campbell from utilizing his approved FMLA leave, complained about his doing so, or told him that he was not allowed to do so, in spite of his frequent use of FMLA leave.  (Campbell Dep. at 102:11-16, 105:3-7, 138:3-22.)

Although he denies that his gambling addiction contributed to his suicidal ideation, Campbell agrees that his "loneliness and depression" may have motivated him to gamble.  (Id. at 79:19-80:25.)  Indeed, while he was suffering from severe depression, his gambling problem

6

escalated dramatically.  By August 2009, Campbell had achieved "Top Level" status at Caesars Atlantic City Hotel & Casino ("Caesar's"), entitling him to unlimited "perks."  (Id. at 134:13-20.)  In order to achieve such a status, Campbell was required to wager *at least* five-hundred thousand dollars ($500,000) in any one year.  (Id. at 135:5-7.)

With his "Top Level" status assured, Campbell invoked his intermittent FMLA leave from August 25 through August 28, 2009, while staying at Caesar's.  (Id. at 163:13-169:12.)  During that stay, Campbell admittedly gambled at least some of the time, spending other time in his room or at the beach.  (Id. at 177:8-20.)  Each morning that he called in sick during that period, Campbell indicated that he would return to work the very next day for a morning shift, though he has also testified that he did not decide whether he was too depressed to work until the very moment that he called, often less than one hour before his shift was scheduled to begin.  (Campbell Dep. at 165:15-166:13.)  In this regard, it is significant to note that it is at least a four and a half hour drive from Atlantic City to Campbell's place of work.  (Id. at 166:14-18.)

On August 27, Scott Wyatt ("Wyatt"), Campbell's supervisor at the time, performed a "home visit" to assess the situation.  (Foxwell Dep. at 50:17-52:4.)  Wyatt found that Campbell was not at his home and that a noticeable volume of mail was visibly protruding from the residence's mailbox.  (Campbell Dep. at Ex. 10.)  Wyatt accordingly concluded that nobody had been at the location for at least several days.  (Id. at Ex. 10.)

Wyatt then spoke with Andy Foxwell ("Foxwell"), another Verizon supervisor, about his suspicion that Campbell was using his FMLA leave to visit casinos in Atlantic City.  (Id.)  After telephoning several of the gambling establishments, Wyatt was connected to the room of one Todd Campbell, but nobody answered.  (Id.)  However, the next day, after once again learning that Campbell had invoked his approved FMLA leave, Wyatt telephoned Caesar's once more.

7

This time, Campbell answered the telephone and admitted that he had been at Caesar's for several days, to which Wyatt responded that they would discuss the matter further upon Campbell's return to work.  (Id.; Campbell Dep. at 170:21-171:7.)

When Campbell returned to work on August 31, 2009, Verizon conducted an informal investigatory hearing during which Campbell again admitted that he had been gambling in Atlantic City while on FMLA leave.  (Supplemental Exhibit A at 6, ECF No. 24-1.)[2]  He also could not be certain that it was his first time using FMLA leave to gamble.  (Id at 7.)  Campbell explained that the trip to Atlantic City was part of an effort to "get away" to relieve anxiety and cope with his depression.  (Id at 6.)  At the same time, he admitted that on one previous occasion, he had called Wyatt from a casino to ask him for an emergency day off.  (Id. at 9.)[3]  Wyatt informed him that he could not accommodate such a request because "[i]t really didn't have anything [to do] with [Campbell's] depression."  (Id.)  To this, Campbell responded: "I told you how much I lost.  *That's depressing*."  (Id (emphasis added).)  Verizon then suspended Campbell without pay, pending an investigation.  (Campbell Dep. at 182:11-15.)

Campbell was asked to return to work on September 3, at which time Wyatt and another supervisor met with Campbell and issued a termination notice which stated as follows:

> You have defrauded the company of sick leave by calling out ill on 8/25/09 thru 8/28/09 when you were at a casino in New Jersey thus violating section 3.3.1 of the Business Code of Conduct.  By calling out ill you also failed to accurately document records as is required in section 3.1.1 of the Business Code of Conduct.

---

[2] "Supplemental Exhibit A" was submitted by Campbell at oral argument without objection from Verizon.  The Court made this document part of the record by Order entered September 7, 2011 (ECF No. 24).

[3] As a part of this line of questioning, Campbell pleaded ignorance, asserting that he did not know that it was wrong to gamble while on FMLA leave.  At oral argument, he pressed this point as if it were relevant, when in fact, it is immaterial.  The Court is aware of no aspect of either claim asserted herein which would forbid Verizon from terminating Campbell simply because he failed to understand the limitations of his FMLA rights.

(Id. at Ex. 11.)  Verizon's Business Code of Conduct section 3.1.1 provides, in relevant part, as

follows:

> You must create accurate records that reflect the true nature of the transactions
> and activities that they record (including the reporting of time and documenting
> attendance and absence).  You must resolve discrepancies in any records and
> make appropriate corrections.  If you suspect or learn that records are misleading
> or contain errors, you must promptly inform your supervisor and, if applicable,
> customers and business providers. . . Verizon does not tolerate falsification or
> improper alteration of records.

(Id.)  And Verizon's Business Code of Conduct section 3.3.1 states:

> Verizon's benefits plans and programs are provided as compensation and must be
> used honestly.  You must not *misrepresent* your health status, your covered
> members, your beneficiaries, or any other facts, *including reasons for absence*, in
> order to claim benefits to which you, or someone else, are not entitled.

(Id. (emphasis added).)

As Foxwell explained during his deposition, Verizon believes that gambling at a casino is

not a proper purpose for exercising FMLA leave.  (Foxwell Dep. at 57:8-23.)  In Foxwell's

opinion, it was inappropriate for Campbell to "use[] this time as paid time off to go to a casino

and gamble."  To clarify, Verizon would not have had an issue if Campbell simply stayed at

home, slept, went fishing, or engaged in some other restful activity to ease his anxiety.  (Id.)

But, as Verizon perceived it, gambling in Atlantic City was a form of "traveling, vacationing,

partying" that it considered beyond the proper scope of Campbell's approved intermittent FMLA

leave.  (Id.)

As an alternative explanation for his termination, Campbell himself volunteers that

Verizon had purely economic motives.  As he testified during his deposition, "I think it was just

a numbers thing.  The economy was turning sour. . . So I think it was strictly to cut payroll and

maybe not necessarily against me specifically."  (Campbell Dep. at 185:7-17.)  In fact, Campbell

explained, under oath, that he is aware of no other reason for his termination other than an

excuse to cut payroll, though now he adds in his *errata* submission that FMLA leave was at least a contributing factor.  (Id. at 185:21-186:5; Campbell's *Errata* Sheet, ECF No. 26.)

Based upon the sequence of events, Campbell commenced this action against Verizon alleging two claims, one for interference with his FMLA rights and the other alleging retaliatory discharge, both of which, if established, constitute violations of 29 U.S.C. § 2615.  (Am. Compl. ¶¶ 11-16.)  After extensive discovery, including Campbell's deposition, Verizon now moves for summary judgment as to both claims.  (Def.'s Br. Sup. Mot. Sum. J. ("Def.'s Br.") at 7-8.)

### III. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 247-48.  Thus, the court must view the record in the light most favorable to the nonmoving party, and must draw all reasonable inferences in its favor.  See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002).  However, "the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008).  Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict."  Thompson v. Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995).

# IV. DISCUSSION

Verizon terminated Campbell because it learned that he was gambling at a time during which he had invoked his pre-approved FMLA leave -- a fact Campbell does not deny.  Not surprisingly, Verizon has moved for dispositive relief, essentially arguing that the undisputed facts support its stated reason for Campbell's termination: that he "defrauded the company of sick leave by calling out ill . . . when [he was] at a casino in New Jersey."  (Campbell Dep. at Ex. 11.)  The Court agrees, finding, in essence, that neither the FMLA, nor common sense, can authorize an employee to, with impunity, enjoy what amounts to a vacation while telling his employer that he is sick and incapacitated.

## A.      Interference with FMLA Rights

The FMLA permits periods of intermittent leave as was approved for Campbell in this case.  However, such leave is not without restriction.  Pursuant to 29 U.S.C.§ 2612(a)(1)(D), which provides the basis for the approved intermittent leave in this case, leave is permitted only if "the employee [is] unable to perform the functions of the position of such employee."  In this case, the parties do not dispute that the approval of intermittent FMLA leave was proper.  However, Campbell has alleged that Verizon interfered with his exercise of such rights.

"It is unlawful for an employer 'to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA].'"  Wright v. Southwest Airlines, 319 Fed. App'x 232, 233 (4th Cir. 2009) (quoting 29 U.S.C. § 2612(a)(1)).  "[T]o state a claim under the FMLA, [a] plaintiff must establish that [he] is entitled to the protections of the FMLA and that [his] employer interfered with, restrained, or denied the exercise of [his] rights under the Act."  Dawson v. Leewood Nursing Home, 14 F. Supp. 2d 828, 832 (E.D. Va. 1998) (citing 29 U.S.C. § 2615(a)(1); Spurlock v. NYNEX, 949 F. Supp. 1022, 1033 (W.D.N.Y. 1996)).

The undisputed record in this case establishes that Verizon never questioned the approval of intermittent FMLA leave; that it never attempted to prevent Campbell from exercising those rights; and that it never complained about his doing so.  (Campbell Dep. at 105:3-7, 138:3-22.) At the same time, Campbell invoked his FMLA rights extensively during his last year with Verizon.  (Id. at 102:11-16.)  The record confirms that Verizon did not prevent Campbell from utilizing his approved FMLA leave, or otherwise engage in any overt conduct to interfere with his exercise of his FMLA rights during the course of his employment.  Thus, Verizon did nothing to "interfere[] with, restrain[], or den[y] the exercise of" Campbell's benefits.  Dawson, 14 F. Supp. 2d at 832.

Campbell's argument in response is, essentially, that Verizon breached a series of regulatory notice requirements concerning how it designated his paid sick leave and that it, therefore, interfered with his exercise of FMLA rights.  Specifically, he alleges that Verizon counted paid leave as FMLA leave, or substituted paid leave for unpaid leave, without providing a written notice as required by 29 C.F.R. § 825.300(d)(4).  (Pl.'s Opp'n Mot. Sum. J. ("Pl.'s Opp'n") at 9-10.)  Pursuant to 29 C.F.R. § 825.300(e), "[f]ailure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."  Campbell also asserts that such a right to notice of substitution of paid leave for FMLA leave could not be "waived" or "traded off" because this would violate 29 C.F.R. § 825.220(d)   Simply stated, the Court rejects Campbell's attempt to contort the technical minutiae of FMLA's regulatory scheme so as to impose liability on an employer for providing benefits *greater* than that required under the statute.  Moreover, existing precedent instructs that Campbell's argument is utterly without merit.

In adopting the FMLA, Congress explicitly provided that "nothing in this Act . . . shall be construed to discourage employers from adopting . . . leave policies more generous than [those required] under this Act." 29 U.S.C. § 2653; Barron v. Runyon, 11 F. Supp. 2d 676, 679 (E.D. Va. 1998). If an employer merely does more than the Act requires, but otherwise complies with its provisions, it cannot be liable under the Act. That is exactly the case here. Had Verizon's policy been to provide the minimum standard required by the Act, all of Campbell's intermittent FMLA leave would have been unpaid. All Verizon did here was to pay Campbell for the time he was off -- that does not amount to an interference with his FMLA rights.

In addition, Verizon's conduct in the first place does not necessarily amount to a *substitution* of paid leave for unpaid leave, nor does it constitute "counting" paid leave against FMLA leave. Rather, Verizon provided its employees with *unlimited* paid sick leave pursuant to a collective bargaining agreement, such that no substitution was necessary. (Foxwell Dep. at 44:4.) As the undisputed record indicates, "all sick leave was paid leave – regardless of whether the leave was covered by FMLA." (Pl.'s Opp'n at 9 (citing Def.'s Br. at 3).) Verizon's explanation is supported by undisputed evidence in the record: "there is no requirement that the employee substitute paid sick leave for unpaid; he receives it automatically." (Def.'s Reply Sup. Mot. Sum. J. ("Def.'s Reply") at 5.)

Here, Verizon unequivocally provided the required written notice that it would count the approved intermittent leave in question against Campbell's total allotment of FMLA leave, and he understood that procedure. (Campbell Dep. at 65:16-66:6.)[4] In the approval notice, Verizon informed Campbell that "[t]he period of your approved leave will be counted toward your twelve (12) workweek FMLA allotment." That is precisely what the regulations require -- that the

---

[4] Campbell, through his counsel during oral argument, conceded that he knew all intermittent leave was credited as FMLA leave.

employee receive notice that the leave is designated as FMLA leave.  See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 87 (2002) ("The regulations make it the employer's responsibility to tell the employee than *an absence will be considered FMLA leave*") (emphasis added).  Thus, there is no doubt but that Verizon satisfied the regulatory notice requirements involved.

Even if there were any doubt regarding the sufficiency of the notice, it is nevertheless undisputed that Campbell subjectively understood that his approved leave would be designated as FMLA leave.  The fact that he understood the point is dispositive of his argument, for the Act's civil enforcement provision "provides no relief unless the employee has been prejudiced by the violation." Ragsdale, 535 U.S. at 89; Moticka v. Weck Closure Sys., 183 Fed. App'x 343, 347 (4th Cir. 2006) (citations omitted).  Thus, there can be no interference from a technical omission from the notice requirement unless such omission led to an "injury."  Here, Campbell can show no such prejudice arising out of a deficiency in any notice.

Finally, during oral argument, Campbell's counsel proposed a secondary argument that whenever an employer questions the nature of an employee's leave, such conduct is "*per se* interference."  Campbell cites no authority supporting such a proposition.  Indeed, the very statement runs counter to at least one appellate court's ruling that "[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave." Allen v. Butler County Comm'r, 331 Fed. App'x 389, 396 (6th Cir. 2006) (citation omitted).  The Court's own review of the relevant statutory provisions is consistent with such a holding and, therefore, the Court rejects any bright-line "*per se* interference" rule.

The fact that Campbell received a benefit not required by the Act -- full payment for at least some of his time off -- does not impose liability upon Verizon.  Campbell understood from

the written notice provided that his approved intermittent leave would count as FMLA leave and he suffered no injury as a result.  And the fact that Verizon investigated Campbell's activities, alone, cannot give rise to an interference claim.  Accordingly, the Court will grant Verizon's motion for summary judgment on the interference claim.

**B.**     **Retaliation**

The more exacting question in the case involves Campbell's retaliation claim.  Verizon's position is that Campbell, in effect, defrauded the company by using his approved FMLA leave to take a vacation in Atlantic City.  Fraud being the sole reason for his termination, Verizon argues that there is no causal connection between his use of FMLA leave and his subsequent termination and, therefore, he cannot establish a *prima facie* case.  And according to Verizon, even if Campbell could establish a *prima facie* case of retaliation, its argument that such fraud violates company policy would serve as a legitimate, non-discriminatory reason for termination in any event.

Campbell responds on two fronts.  First, he argues that Verizon "fired him for taking the [FMLA] leave."  Second, he argues that Verizon's proffered reason is pretextual.  Neither of Campbell's arguments is convincing, but the standard for establishing a *prima facie* case is not high and, based solely on the temporal proximity between the taking of FMLA leave and termination, the Court will accept, for purposes of discussion, that he establishes a *prima facie* case.  Nevertheless, summary judgment will still be granted for Verizon because Campbell offers no evidence to rebut the *bona fides* of the legitimate, non-discriminatory reason set forth by Verizon for terminating his employment.

Retaliation claims brought pursuant to the FMLA are analyzed according to the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Yashenko v.</u>

15

Harrah's NC Casino Co., LLC, 446 F.3d 541, 550-51 (4th Cir. 2006).  "[T]o succeed on [a]
retaliation claim, [an employee] must first make a *prima facie* showing 'that he engaged in
protected activity, that the employer took adverse action against him, and that the adverse action
was causally connected to the plaintiff's protected activity.'"  Id. at 551 (quoting Cline v. Wal-
Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998)).  If an employee establishes a *prima facie*
case, the burden then shifts to the employer to offer a "non-discriminatory explanation" for the
adverse action taken.  Id.  But once such a legitimate, non-discriminatory explanation has been
offered, the burden shifts back to the employee, who "bears the burden of establishing that the
employer's proffered explanation is pretext for FMLA retaliation."  Nichols v. Ashland Hosp.
Corp., 251 F.3d 496, 502 (4th Cir. 2001).

### 1.     *Prima Facie* **Case**

The parties agree that the sole disputed element of Campbell's *prima facie* case is the
causative link between the exercise of his FMLA rights and his subsequent termination.  (Def.'s
Br. at 8; Pl.'s Opp'n at 6-7.)  Although not clearly articulated by Campbell, proximity in time
between the two events is the sole fact giving rise to a reasonable inference of causation.  Alone,
the fact may not be conclusive on the merits.  However, Campbell's burden at this stage is not a
heavy one, and so temporal proximity, alone, is sufficient to establish a causal link for purposes
of establishing his *prima facie* case.

In resolving a motion for summary judgment, the non-movant benefits from all favorable
inferences.  Brinkley v. Harbour Rec. Club, 180 F.3d 598, 619 (4th Cir. 1999) (citations
omitted).  It is well recognized in the Fourth Circuit, the appellate authority governing this Court,
that temporal proximity between an employee's use of FMLA leave and subsequent termination
gives rise to a reasonable inference of causation.  "While evidence as to the closeness in time 'far

16

from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a *prima facie* case of causality.'"  Yashenko, 446 F.3d at 551 (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989)); but see Hoskins v. Pridgeon & Clay, Inc., No. 1:05cv816, 2007 U.S. Dist. LEXIS 24674, at *30 (W.D. Mich. April 3, 2007) ("[T]he temporal proximity between the protected activity (FMLA leave) and the adverse employment action (termination) in this case is of little evidentiary value because the reason for the termination -- FMLA fraud -- and the termination decision would generally be expected to occur in close proximity to each other").

Although the Court may be ultimately unconvinced, for purposes of resolving the motion for summary judgment, the Court defers to existing Fourth Circuit precedent.  Campbell was terminated just days after he returned from FMLA leave.  Thus, the Court concludes that causation may be inferred due to the temporal proximity between Campbell invoking FMLA leave and Verizon's termination of his employment.

While the conclusion reached troubles the Court due to the appearance that the Court might approve of Campbell's conduct, the Court is equally mindful of a unique difficulty in this case.  Verizon's proffered legitimate non-discriminatory reason for terminating Campbell, and all the undisputed facts associated therewith, remains the lone explanation in opposition to the temporal proximity between the protected activity and termination.  Campbell has "survived" only a procedural hurdle.  A termination for defrauding an employer nevertheless constitutes a legal basis for non-discriminatory termination.  Thus, Campbell's apparent "success" in establishing a *prima facie* case must not be read to suggest anything with regard to the merits of his case.  Understanding this, the Court now addresses the central issue in the case.

17

### 2.      Legitimate Non-Discriminatory Basis for Campbell's Termination

Campbell has offered no evidence to demonstrate that Verizon's legitimate, non-discriminatory rationale for firing him -- defrauding the company -- is pretextual.[5]  Instead, he has attempted to twist the reason "on itself," portraying his gambling activity as a permissible use of his approved intermittent FMLA leave.  His attempt must fail, and the remaining record only supports Verizon's proffered reason for Campbell's termination, requiring the Court to accept Verizon's stated reason and grant summary judgment in its favor.  <u>Yashenko</u>, 446 F.3d at 551.

### a.      Gambling is Not a Proper Use of FMLA Leave

In his attempt to "twist" the FMLA to suit his purpose, Campbell argues that Verizon could not prohibit his use of FMLA leave to gamble because it had "placed absolutely no restriction on what Campbell could or could not do during his leave."  (Pl.'s Opp'n at 1.)  At the same time, Campbell himself acknowledges that the purpose of his intermittent leave was "to treat a *chronic health condition* pursuant to the [FMLA]."  (<u>Id</u> (emphasis added).)  Simply put, it is intellectually dishonest to assert such a position, as Campbell has done here.  Gambling does not alleviate a "chronic health condition."  Moreover, Campbell's position ignores the obvious, inherent limitation that the absence in question must result from the *approved FMLA purpose --*

---

[5] Campbell suggests that Verizon's proffered reason for terminating his employment is a mere pretext, pointing to a supposed argument offered by Verizon that it "fired Campbell because he told them he was seeking medical treatment during the August 25-28 timeframe."  (Pl.'s Opp'n at 8.)  Verizon challenges the claim as lacking support in the record.  (Def.'s Reply at 7 n.3.)  Indeed, as a result of the 2011 Amendments to Fed. R. Civ. P. 56(c), it is now incumbent upon the parties to support their factual assertions by "citing to *particular* parts of materials in the record."  (Emphasis added).  The Court reads the new provision to place a burden on the parties to establish whether a fact is genuinely in dispute by reasonably identifying in the record where such fact finds support -- most likely by use of a "pinpoint" citation.  Where, as here, a party utterly fails to cite the record in support of a fact, let alone by precise reference, the Court need not consider that fact.  Fed. R. Civ. P. 56(c)(3).  Accordingly, the Court disregards Campbell's assertion that Verizon has offered an inconsistent basis for his termination.

in this case, to address medical or mental conditions, such as migraine headaches, severe depression, and anxiety.  (Campbell Dep. at 65:16-68:20.)

In fact, Verizon's FMLA certification is silent as to what specific purposes each of the intermittent absences might serve.  It could be to obtain treatment.[6]  Or, as could be reasonably inferred in Campbell's favor here, it could be that his treating physician advised him to alleviate the symptoms of his anxiety through occasional respite from the stress of work.  Such a deduction would suggest that his approved FMLA leave permitted Campbell to call in sick for the sole purpose of enjoying some much-needed leisure time.  However, he offers no testimony to suggest that his physicians would allow a patient who suffers from an anxiety disorder to gamble as part of a clinically-approved respite.  Given his admitted gambling addiction, the only reasonable inference to be drawn, absent admissible testimony to the contrary, is that his physicians would advise *against* such activities.  And even if his admitted gambling addiction were related in some way to his qualifying medical conditions, the FMLA would not shield him from personal responsibility while *acting* upon his addiction.  See, e.g., Sloop v. ABTCO, Inc., No. 98-2440, 1999 U.S. App. LEXIS 8600, at *8 (4th Cir. May 6, 1999) ("There is no evidence that Congress intended the FMLA to cover medical leave precipitated by substance abuse without regard for the personal responsibility of the employee") (emphasis added).

Even assuming that "rest and relaxation" constitute approved FMLA leave, it is indisputable that Campbell's August 2009 hiatus went well beyond the scope of such an approved absence.  First, the absence lasted for a total of four work-days -- more than the

---

[6] Verizon had separately approved Campbell to utilize intermittent leave for "Scheduled Multiple Treatments" in up to four (4) hour increments.  (Pl.'s Opp'n at 3.)  It appears to be undisputed that the more general approval for absences of one to three days did not require Campbell to obtain treatment.  The issue is, therefore, irrelevant.

approved maximum.[7]  (Campbell Dep. 170:5-9.)  Second, taking time off to enjoy a mini-vacation gambling is not conceivably within the bounds of FMLA leave.  Congress could not have intended such an absurd abuse of the FMLA, and this Court can find no authority to support such a contortion of the statutory scheme.  Rather, the Court has found a number of cases supporting an employer's right to guard against such abuse.  See, e.g., Allen, 331 Fed. App'x at 396 ("Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave") (citation omitted); Callison v. City of Philadelphia, 430 F.3d 117, 121 (3d Cir. 2005) (same); Honeycutt v. Balt. County, Md., No. JFM-06-0958, 2006 U.S. Dist. LEXIS 49315, at *11 (D. Md. July 7, 2006) (same) (citations omitted).

Verizon may not have explicitly set forth the boundaries of the approved leave, but Campbell was certainly bound by his own common sense.  Common sense dictates that where the employee has obtained approval to take FMLA leave to treat severe depression, migraines, and stress-related anxiety (Campbell Dep. at 65:16-68:20), the employer did not intend the employee to use the leave for any other purpose -- such as to gamble.  Calling in sick to gamble was an abuse of Campbell's approved intermittent leave and, by extension, an abuse of the FMLA.  It would be unreasonable for an employee to think otherwise.  Such abuse was undoubtedly a legitimate, non-discriminatory reason for Verizon to terminate Campbell's employment.

Moreover, the outcome proposed by Campbell would render it impossible to "balance the demands of the workplace with the needs of employees to take leave for eligible medical

---

[7] Campbell testified that he should have been given an opportunity to seek post-hoc approval of a period greater than the pre-approved three (3) day limit.  (Campbell Dep. at 170:8-13.)  Even assuming that this is true, it would not change the analysis here.  The Court's conclusion is not based on his exceeding the approved three (3) day maximum, and Verizon did not rely upon the time limit as a basis for Campbell's termination.

conditions," as was Congress's intention in passing the Act.  Babcock v. BellSouth Adver. & Publ'g Corp., 348 F.3d, 73, 76 (4th Cir. 2003) (quoting Hukill v. Auto Care, Inc., 192 F.3d 437, 441 (4th Cir. 1999)) (internal quotation marks omitted).  It equally diminishes the protections afforded to those who properly exercise their rights under the Act.  No rational person could believe that Congress intended such a perversion of labor law when it passed the FMLA.  And without strong controlling precedent instructing the Court to do otherwise, it will not permit such an outcome in this case.

Somewhat to the Court's surprise, Campbell took the novel position during oral argument that "vacation" ought to be a permissible use of his intermittent FMLA leave.  That is, the "rest and relaxation" that the Court fairly perceives *may* be permissible for a person with an anxiety disorder is indistinguishable from a vacation.  In essence, a person is free to relieve anxiety in any way he sees fit.  However, by Campbell's own admission, gambling *causes*, rather than *relieves*, his depression.  (Supplemental Exhibit A at 9, ECF No. 24-1 ("I told you how much [money] I lost [gambling].  *That's depressing*") (emphasis added).)  Certainly, a vacation which *contributes* to an employee's own sickness is well-beyond the bounds of any clinically-approved "rest and relaxation."  Wherever the line between FMLA leave and vacation may be, Campbell has clearly crossed it.

### b.      Verizon's Disapproval of Gambling

Campbell also speculates that Verizon's true motive for terminating his employment is its disapproval of his gambling.  Such is not what the record indicates; rather, the record indicates that Verizon considered itself misled about the true nature of Campbell's absences.  Had he simply used vacation time to gamble, there is no indication that Verizon would have found such

activity objectionable.  It was the fact that Campbell was using FMLA leave for a vacation purpose that Verizon perceived as unacceptable.

Even if Verizon did find gambling objectionable, Campbell's argument would still fail to establish an unlawful motive for his termination.  If, as Campbell argues, Verizon was motivated by its distaste for his gambling addiction, then it most certainly was not motivated by his use of the approved intermittent FMLA leave.  Such a morally-based judgment, even if unwise or unfair in a general sense, would not provide grounds for relief pursuant to the FMLA.  "Without evidence of pretext for retaliation, this Court will not act as a 'super-personnel department that reexamines an entity's business decisions.'"  Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir. 1998) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)).

### c.      Economic Reasons for Termination

Campbell also opined in his deposition testimony that Verizon was motivated by economic concerns.  He believes that "it was just a numbers thing.  The economy was turning sour . . . it was strictly to cut payroll and maybe not necessarily against me specifically." (Campbell Dep. 185:7-17.)  Notwithstanding that he has no evidence to support this theory, other than his own speculation, economic motives would not implicate the FMLA.  Accordingly, such motives would not defeat Verizon's request for dispositive relief.

### d.      Summary Judgment where State of Mind is at Issue

The Court is well aware that "summary judgment is *seldom* appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense." Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis added) (citation omitted) (internal quotation marks omitted); see also Magill v. Gulf and W. Indus., Inc., 736 F.2d 976, 979 (4th Cir. 1984).  Here, however, there is simply no evidence whatsoever that Verizon

was motivated by anything other than Campbell's own abuse of his approved intermittent FMLA leave.  In fact, the other justifications offered by Campbell for his termination -- economic or moral -- do not implicate retaliation for his use of FMLA leave.

Ultimately, this case is much simpler than Campbell portrays it.  He was caught gambling while taking FMLA leave.  Verizon fired him because they were misled to believe he was sick when, in fact, he admits that he was gambling.  The undisputed facts of this case demonstrate that the sole reason for his termination was that his use of FMLA leave to gamble defrauded the company -- a legitimate non-discriminatory reason.  Accordingly, summary judgment in Verizon's favor is proper.

## V. CONCLUSION

For the reasons discussed herein, Defendant's Motion for Summary Judgment (ECF No. 20) is GRANTED and the Plaintiff's Motion for Leave (ECF No. 27) is DENIED.

An appropriate Order shall issue.

/s/

Dennis W. Dohnal
United States Magistrate Judge

Richmond, Virginia
Dated: September 13, 2011